# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James B. Moran | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 99 C 6869 & 00 C 765 | DATE | 1/25/2001 |
| CASE TITLE | Tom Anderson etc. Vs. Abbott Laboratories et al. Lena Gallagher etc. vs Abbott Laboratories et al | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

Memorandum Opinion and Order

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendants' motions to dismiss both complaints are granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | number of notices | Document Number |
|---|---|---|---|---|
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | | |
| ✓ | Docketing to mail notices. | | | 21 |
| ✓ | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | | |

JAN 2 9 2001

date docketed

docketing deputy initials

date mailed notice

DOCKETING

JAN 26  AM 9: 02

| WAH | courtroom deputy's initials | | Date/time received in central Clerk's Office | mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TOM ANDERSON, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | No. 99 C 6869 |
| ABBOTT LABORATORIES, an Illinois corporation, and MILES D. WHITE, | ) ) ) | |
| Defendants. | ) ) | |
| LENA GALLAGHER, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | No. 00 C 765 |
| ABBOTT LABORATORIES, an Illinois corporation, and MILES D. WHITE, | ) ) ) | |
| Defendants. | ) ) | |

DOCKETED

JAN 2 9 2001

## MEMORANDUM OPINION AND ORDER

Plaintiffs have sued Abbott Laboratories (Abbott), Miles D. White (White) and Thomas

D. Brown (Brown) (collectively "defendants"), alleging securities fraud in violation of §§ 10(b)

and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule

10b-5. We have two complaints before us, one on behalf of Abbott shareholders and one on

behalf of ALZA Corp. (ALZA) shareholders.[1] Both complaints involve the same core facts:

defendants' failure to disclose FDA compliance issues, so we decide them together. Defendants

---

[1] As discussed below, ALZA shares tracked Abbott's because of an announced stock acquisition.

move to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6) and failure to plead fraud with particularity under Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u-4(b)(1). For the following reasons, defendants' motions are granted.

## FACTS

Abbott is a publicly-traded company. Defendant White has served as Abbott's chief executive officer since January 1, 1999, before which he served as president of Abbott's Diagnostic Division (ADD). Defendant Brown is ADD's current president. ADD manufactures and distributes medical systems and tests for doctors, hospitals and consumers, and contributes about 20 per cent of Abbott's total revenues. FDA regulations require that companies such as Abbott develop and enforce strict quality control procedures. Abbott, and ADD in particular, has had ongoing compliance issues with the FDA, culminating in a consent decree entered on November 2, 1999.

The FDA has inspected ADD's facilities several times since 1993. Each time it has noted shortcomings in Abbott's quality control policies and practices. Abbott operated under an FDA-monitored compliance plan from July 19, 1995, through February 26, 1998. Upon terminating the plan, the FDA noted its continuing concerns about Abbott's compliance. The FDA conducted another inspection from September 8 through November 4, 1998, and informed Abbott of regulatory violations at meetings on November 12, 1998 and January 8, 1999. Abbott made no mention of these outstanding regulatory issues in its 1998 10K, filed March 9, 1999.

The Abbott shareholders' alleged class period began on March 17, 1999, when the FDA

issued a warning letter to Abbott. This letter identified several continuing violations and advised Abbott that the FDA would take enforcement measures without further warning if the company did not immediately resolve its compliance issues. Abbott did not amend its recently filed 10K. The company made several additional public statements during the class period through SEC filings and press releases. Drawing from both complaints, we list the statements chronologically (all dates in 1999).

| | | |
|---|---|---|
| (1) | March 9 | 10K |
| (2) | March 9 | Annual report |
| (3) | April 8 | First quarter press release |
| (4) | April 23 | White's comments to shareholders |
| (5) | May 14 | 10Q |
| (6) | June 21 | ALZA acquisition announcement |
| (7) | July 9 | Perclose acquisition announcement |
| (8) | July 9 | Second quarter press release |
| (9) | August 13 | 10Q |
| (10) | August 16 | Joint proxy statement (with ALZA) |
| (11) | September 29 | Press release |
| (12) | October 11 | Third quarter press release |

Other than the September 29 release, none mentioned the ongoing FDA compliance issues.

During this period several pertinent events occurred. On April 13, 1999, White exercised options to purchase 130,453 Abbott shares. He financed this transaction by "selling" 89,895 shares, representing 30 per cent of his Abbott holdings, at the $52.72 market price. *Bloomberg News* reported the warning letter on June 15, with no substantial market reaction. The FDA conducted another inspection from May 10 through July 8, 1999, at the conclusion of which it served Abbott with a Form 483, noting further regulatory violations. During and immediately following this audit Abbott announced two acquisitions: ALZA on June 21, 1999, and Perclose, Inc. on July 9, 1999. The target companies' shareholders were to receive Abbott shares, so their stocks began to track Abbott's once the deals were announced. June 22, 1999,

therefore, marks the beginning of the ALZA shareholders' class period. ALZA's shareholders approved the acquisition on September 21, 1999.[2]

On September 29, 1999, Abbott finally spoke publicly about its FDA compliance issues. The press release acknowledged the FDA's allegations, the threatened enforcement actions and pending consent decree negotiations, but contested the charges, insisting Abbott "believes that it is in substantial compliance with these regulations." Abbott shares dropped from $40.00 to $37.50 the following day, but recovered. Perclose postponed its vote on the pending acquisition, originally scheduled for October 8, 1999.[3]

Then, on November 2, 1999, Abbott entered a consent decree with the FDA, agreeing to pay a $100 million civil fine and to withdraw 125 products from the market. This was the largest civil fine ever imposed by the FDA. The company announced it would record a $168 million pretax charge to account for the fine and inventory write-down, driving shares down from $40.31 on November 1, 1999, to $36.81 on November 3, 1999.

Several groups of Abbott shareholders filed separate suits against Abbott. We consolidated them into one, a class action including all Abbott shareholders who purchased stock between March 17, 1999, when Abbott received the warning letter, and November 2, 1999, when Abbott announced the consent decree. *See* Minute Order (Feb. 1, 2000). A group of ALZA shareholders, who had purchased stock between June 21, 1999, when Abbott announced its agreement to acquire ALZA, and November 2, 1999, filed a similar suit.

---

[2] Abbott and ALZA later abandoned the deal when negotiations with the FTC failed.

[3] Perclose shareholders eventually approved the deal after the companies issued a supplemental proxy statement.

## DISCUSSION

To state a Rule 10b-5 claim plaintiffs must prove that defendants made a misstatement or omission of material fact, with scienter, in connection with the purchase or sale of securities, upon which plaintiff relied, and that reliance proximately caused plaintiff's injury. *See* Stransky v. Cummins Engine Co., 51 F.3d 1329, 1331 (7th Cir. 1995). As always, we accept all well-pleaded facts as true in considering a motion to dismiss. *See* Turner/Ozanne v. Hyman/Power, 111 F.3d 1312, 1319 (7th Cir. 1999). But Fed. R. Civ. P. 9(b) requires that the complaints state fraud allegations with particularity. Unlike notice pleading, where it is sufficient that we be able to imagine some set of facts under which plaintiffs could prevail, a fraud complaint must explicitly set forth all the pertinent facts. "This means the who, what, when, where and how: the first paragraph of any newspaper story." DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990). Congress, in enacting the PSLRA, reinforced the importance of specificity in alleging securities fraud and added some particularly stringent requirements. *See* 15 U.S.C. § 78u-4(b)(1) ("[T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."). Moreover, it is no longer sufficient that fraud be one reasonable inference from the pleaded facts. The facts must provide a "strong inference" of impropriety. *See* 15 U.S.C. § 78u-4(b)(2).

Plaintiffs do not allege any misstatements but, instead, rely solely on omissions. Abbott clearly omitted facts about its ongoing problems with the FDA from its public filings and statements. Defendants did not disclose their prior violations – the warning letter, the May-

July 1999 reinspection, the number of continuing violations or the status of their negotiations with the FDA – until the September 29, 1999 press release. To determine whether these omissions are sufficient to state a securities fraud claim we will focus on three (partially overlapping) questions. Were the omitted facts material? Were defendants' existing statements misleading? And did defendants have the necessary mental state to be liable for fraud?

## I. Materiality

Plaintiffs must first establish that these omissions were material, meaning "there is a substantial likelihood that disclosure of the information would have been viewed by the reasonable investor to have significantly altered the total mix of information." Searls v. Glasser, 64 F.3d 1061, 1066 (7th Cir. 1995). The history between Abbott and the FDA makes all the undisclosed information, viewed in context, seem fairly inconsequential. An investor with full information would see a series of inspections, Forms 483, negotiations, re-inspections, more Forms 483 and more negotiations. Abbott had also been in, and out, of an FDA monitoring plan. Plaintiffs appear to concede that events prior to March 17 did not require disclosure to that point.[4] Given the repeating cycle of inspections, findings and negotiations, without any FDA sanctions, plaintiffs must give us a reason to believe this time was different – something that shows Abbott's prospects had genuinely changed or something from the FDA that said, "This time we're serious." This plaintiffs have failed to do.

There is nothing magical about the warning letter. Although the language sounds

---

[4] If defendants had a duty to disclose prior to March 1999, the 10K and annual report would have been misleading when filed. Plaintiffs do not allege this, but rather claim that events subsequent to March 17 created a duty to update those prior filings.

ominous, it really is rather boilerplate. *See* In re Herbalife Sec. Litig., 1996 U.S. Dist. LEXIS

11484 at *11 n.3 (C.D. Cal. Jan. 26, 1986). This is affirmed by the market's reaction, or lack

thereof, to its eventual disclosure. The *Bloomberg News* report prompted no substantial

movement.[5] If reasonable investors believed the letter altered the total mix of information, the

market would have reacted, at least a little bit.

The May-July 1999 inspection also undermines plaintiffs' claims. Clearly, if the FDA

were planning another audit, the agency had not yet decided to sanction Abbott, certainly so

far as defendants could tell. Abbott had no reason to say anything, at least until after the new

inspection. *See* Acito v. Imcera Group, Inc., 47 F.3d 47, 53 (2d Cir. 1995) (finding no duty to

disclose violations because not a forgone conclusion company would fail reinspection); *see also*

Ballan v. Wilfred American Educational Corp., 720 F.Supp. 241, 248 (E.D.N.Y. 1989) (finding

corporate officer's imminent indictment and resulting financial disaster were not "facts" and

need not be disclosed while investigation was pending). Even after the inspection and the

resulting Form 483, plaintiffs have not alleged facts suggesting this was any different from the

many prior inspections and Form 483 findings. At some point, as the September 29 press

release indicated, the situation did change. But plaintiffs bear the burden to plead facts

showing both how and when they changed. They have failed to do either.

## II. Misleading Statements

Even material omissions are not, in and of themselves, sufficient to state a claim for

securities fraud. Plaintiffs must show that defendants had a duty to disclose that information.

---

[5] This news service is so prevalent in the financial world that we can safely conclude the warning letter was "on the market." Besides demonstrating how immaterially investors viewed the warning letter, this also means Abbott cannot be liable for failing to disclose the letter to anyone who purchased their shares after June 15. *See* Wieglos v. Commonwealth Edison Co., 892 F.2d 509, 516 (7th Cir. 1989). To claim the market might not have noticed a major news item carried by *Bloomberg* is just not reasonable.

*See* Stransky, 51 F.3d at 1331 ("Mere silence about even material information is not fraudulent absent a duty to speak."); Shaw v. Digital Equipment Corp., 83 F.3d 1194, 1202 (1st Cir. 1996) ("The proposition that silence, absent a duty to disclose, cannot be actionably misleading, is a fixture in federal securities law."). One way such a duty can arise is if omitting particular facts makes some existing statement misleading. *See* 17 C.F.R. § 240.10b-5 ("[T]o omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."); Stransky, 51 F.3d at 1331 ("If one speaks, he must speak the whole truth."). This forms the heart of plaintiffs' claims. The complaint refers to several public statements and alleges that Abbott's failure to mention its regulatory problems made them misleading.

Whether a fact is material and whether a statement omitting it is misleading are closely intertwined. The more important a fact would be to investors, the more likely its omission will mislead them. Consequently, materiality is more like a continuum than a simple yes or no, material or immaterial. On one extreme, some facts are so important they independently demand disclosure. Silence on the issue is itself misleading.[6] On the other extreme are direct misstatements. Because investors rely on them, inaccurately reporting even the most marginally material facts will likely mislead. This case, alleging that existing statements triggered the duty to disclose additional information, rests between these poles. Discussing an issue, while withholding specific facts, can mislead. Merely mentioning a topic, however, does not require the company to disclose every tangentially related fact that might interest investors, only those that are sufficiently important. If omitting the fact would make the

---

[6] In these situations, such as a merger or plant shutdown, companies will typically issue an immediate press release, rather than wait until the next SEC filing.

statement so incomplete as to be misleading, the company must disclose it. But omitting smaller details, even if investors might care about them, is not necessarily misleading.

We now look at defendants' public statements to determine whether any were misleading. Because the complaints differ in which statements they rely upon, and espouse different legal theories, we analyze them separately.[7]

## A. The Abbott Shareholders

Of the twelve statements listed above, there are four that this complaint does not cite at all: the three quarterly press releases (April 8, July 9 and October 11, 1999) and the August 16, 1999 proxy statement. Because they were not pled, we need not discuss them with respect to these plaintiffs.

On four additional occasions the complaint refers to a document without identifying any specific statement as misleading. These are the two 10Q's (May 14 and August 13, 1999) and the two acquisition announcements (ALZA on June 21 and Perclose on July 9, 1999). Plaintiffs contend that these documents are misleading because they do not disclose the regulatory issues. Under Fed. R. Civ. P. 9(b) and the PSLRA, 15 U.S.C. § 78u-4(b)(1), plaintiffs must, at the very least, identify which statement is made misleading by defendants' omission. Their failure to do so is fatal to those claims.

This leaves four statements to which plaintiffs do specifically refer: the 10K, the annual report, White's April 23 comments and the September 29 press release. Plaintiffs' theory amounts to a claim that, because Abbott failed to disclose the severity of its regulatory problems, they paid inflated prices for the stock.

---

[7] We also note that the ALZA complaint does not name defendant Brown individually.

Plaintiffs also argue that some of defendants' statements amounted to projections of future performance. It would be misleading for defendants to forecast positive results, plaintiffs assert, if they knew their regulatory problems jeopardized future performance. "Forward-looking statements" may in rare circumstances be actionable, but they are typically considered a safe harbor. *See* In re: Healthcare Compare Corp. Sec. Litig., 75 F.3d 276, 282 (7th Cir. 1996). Because they are by definition only predictions, not guarantees, the standard is particularly stringent. To state a claim plaintiffs must show that the speaker had no reasonable basis for the projections when made. Searls, 64 F.3d at 1066. Even at this preliminary stage "plaintiffs have the burden of pleading sufficient facts to call the reasonable basis of [defendants'] statements into question." Healthcare Compare, 75 F.3d at 282. This, too, they cannot do. Plaintiffs seem to argue that because Abbott entered the consent decree on November 2, defendants must have known that they would face sanctions. But temporal proximity alone, between the positive statement and the negative event, is insufficient. *See id.* at 283. Plaintiffs must plead specific facts leading us to question defendants' basis for their comments.

In evaluating plaintiffs' claims we must scrutinize defendants' statements in some detail. We consider both whether omitting factual information about regulatory problems made the statements misleading, and whether Abbott made positive projections without a reasonable basis. We review the four remaining statements chronologically.

Although plaintiffs allege the class period began March 17, 1999, when Abbott received the warning letter, they attempt to base liability on the 10K and annual report, both filed March 9, 1999, by asserting that Abbott had a duty to correct previous statements. Plaintiffs

are confusing two distinct concepts: the "duty to correct" and the "duty to update," as defined by the Seventh Circuit. "The former applies when a company makes a historical statement that, at the time made, the company believed to be true, but as revealed by subsequently discovered information actually was not." Stransky, 51 F.3d at 1331. In contrast, "a duty to update arises when a company makes a forward looking statement – a projection – that because of subsequent events becomes untrue." Id. at 1332. The Seventh Circuit recognizes the duty to correct, but has expressly rejected the duty to update. Id.; see also Fry v. UAL Corp., 895 F.Supp. 1018, 1046 n.26 (N.D. Ill. 1995); cf. Healthcare Compare, 75 F.3d at 282 (discussing duty to correct where circumstances which made statements false arose prior to the statements).

Plaintiffs' allegations here sound more like the latter. The 10K did not assert that Abbott was in full compliance with all regulations, or that it had no outstanding regulatory issues. Had defendants done so, they would have had a duty to correct that factual misstatement because the violations existed at the time, even if defendants did not know about them. Plaintiffs claim that once Abbott received the warning letter it should have disclosed its regulatory problems. The letter was not, however, a legal finding of past violations. Rather, it indicated that the FDA was more likely to take serious actions against Abbott, possibly casting the company's future prospects in a new light. By plaintiffs' own assertion, the letter changed Abbott's future outlook, not its past. Because there is no duty to update projections based on changed circumstances, plaintiffs cannot base liability on defendants' failure to update the 10K or annual report.

Even if there were a duty to update the 10K, it would not apply here. The 10K (at least

the portion quoted in the complaint) lists product names and describes the distribution network, but says very little about Abbott's regulatory environment. The "Regulation" section is nothing more than a boilerplate statement of what the government regulates and what sanctions it can impose. All this information could be gleaned from the C.F.R. It says nothing company-specific, and no reasonable investor would infer anything about the state of Abbott's FDA compliance. Because the omission does not render the statement misleading, it is not actionable.

Reliance on the concurrently issued annual report is equally futile. The excerpt mostly just identifies new products and describes what they do. The complaint does not allege that these facts are false. Abbott does participate in the listed market segments. Its Imx and AxSym systems are arguably "among the most successful in the industry." And no one contends that nucleic acid probes are not the fastest growing *in vitro* segment. Moreover, these statements in no way implicate Abbott's regulatory record. These statements could not mislead a reasonable investor into drawing conclusions about quality control standards.

The report also claims Abbott is a leader and has grown in certain market segments, potentially suggesting future performance. But this argument falls flat, too. First, these statements refer backwards. They talk about what Abbott has done. Second, they are practically devoid of content. Vague statements about industry leadership and unquantified growth are classic puffery, and are generally not actionable. *See* Stransky, 51 F.3d at 1333. Courts have even held significantly more specific predictions, projecting growth of "10% to 30% over the next several years," too vague to be actionable. *See* Raab v. General Physics Corp., 4 F.3d 286, 290 (4th Cir. 1993).

White's April 23 remarks do not support a claim for the same reasons. He discusses his opinions about how Abbott had achieved recent successes, citing four reasons:

> First, we redefined our position. We chose not to see ourselves as a giant in immunodiagnostics, but as a small player in the broader, total diagnostics field, vastly expanding our universe of opportunities. Second, we listened very closely to the customer to understand what the market wanted. Then we focused our R&D and acquisition efforts precisely to meet those needs. Finally, we managed costs aggressively.

Defining market positioning, listening to customers and making strategic acquisitions have nothing to do with quality control compliance. Research and development and cost management are tangentially relevant because R&D is regulated and because plaintiffs allege that cost-cutting led to the regulatory violations. But all White claimed was that Abbott expanded its R&D to the "total diagnostics field" and directed new product development to meet perceived customer needs. This is too far removed from quality control compliance to mislead a reasonable investor; nor would vague references to managing costs, without any reference to quality control or regulatory compliance, do so either. In fact, the entire excerpt does not once mention quality control standards, the FDA or regulatory compliance. No investor could reasonably conclude, based on White's statement, that Abbott had no pending FDA issues.

Lastly, plaintiffs quote a clearly forward-looking statement. White stated, "We expect this [growth] trend to continue for the foreseeable future, due to the unprecedented state of our new product cycle. By supplementing our internal investment with opportunistic technology acquisitions, Abbott's diagnostics pipeline is fuller than ever before." These predictions may or may not come true. But plaintiffs failed to allege that White had no reasonable basis for them as of April 23, 1999. There is no claim that Abbott did not have a

"full pipeline" or that its new product cycle was in bad shape. And Abbott announced two "opportunistic technology acquisitions," ALZA and Perclose, within the next six weeks. Plaintiffs' only argument is that Abbott must have known, as early as April 23, 1999, that the FDA would block its new products, and that its growth would not continue. But on the very same page of the complaint plaintiffs plead that the FDA reinspected Abbott's facilities from May 8 to July 10, 1999, *after* White's speech. If the FDA was still giving Abbott an opportunity to fix its problems, then sanctions were still far from certain. By its own pleadings, plaintiffs demonstrate that White had a reasonable basis for his remarks.

Plaintiffs attempt to analogize Abbott's behavior with <u>Grossman v. Waste Management</u>, where the court found the company had a duty to disclose potential regulatory violations. *See* 589 F.Supp. 395 (N.D. Ill. 1984). But this case is readily distinguishable. Waste Management had explicitly touted its environmental record:

> In the company's 1981 annual report, Waste Management stated that it "set the standards for the entire industry" for environmental excellence, among other things, and that the company's growth was in large part the result of "environmentally sound handling of a broad range of materials." Further, the report stated that the company was "responsive to public concern for the protection of the environment" and that it had adopted "stringent company-wide procedures designed to safeguard natural resources."

*Id.* at 410. To make these claims, while failing to disclose a series of pending EPA allegations, is clearly misleading. Abbott, in contrast, did not claim to have any particular regulatory prowess. It did not represent itself as having an abnormally strong compliance record or specifically attribute its past success to outstanding quality control. It merely reported specific FDA actions, *i.e.*, approvals of particular products. In fact, the passages quoted in the complaint do not even remotely touch on regulation, so they could not have misled investors to believe there were no regulatory issues.

The September 29, 1999, press release finally acknowledged the FDA issues. Nonetheless, plaintiffs argue even this statement was misleading because it downplayed the situation's severity. The release discussed the warning letter, the ensuing re-inspection and the government's threatened sanctions. These were all true at the time. Abbott's maintenance of its innocence is not fraud. SEC rules do not create a duty to confess contested charges. Take, for example, the situation where a tender offeror has been accused of some wrongdoing:

> Where there exists a good faith dispute as to facts or an alleged legal violation, the [law] only requires disclosure of the dispute. There are good reasons for this limitation. A tender offeror should not be placed in a position of being forced to either admit liability, while he or she disputes it, or violate the securities law by failing to disclose the alleged and disputed violation. As long as the tender offeror discloses to the target shareholders that a good faith dispute exists as to an alleged violation of law, a shareholder has sufficient information to make a rational and informed decision.

City Capital Assoc. v. Interco, Inc., 696 F. Supp. 1551, (D. Del. 1988) (citations omitted). This same reasoning applies to proxy disclosures and should extend to 10(b) as well. See Ballan v. Wilfred American Edu. Corp., 720 F.Supp. 241, 249 (E.D.N.Y. 1989) ("[T]he SEC's proxy disclosure rules do not require a company's management to confess guilt to uncharged crimes, or 'to accuse itself of antisocial or illegal policies.' ... There is no reason why a different rule should apply under § 10(b).") (citations omitted).

On September 29, 1999, Abbott was still negotiating with the FDA, and the FDA had not yet filed suit. Abbott expressed its opinion about its own compliance, but the risks were abundantly apparent on the statement's face. Investors can evaluate this sort of posturing for what it is worth. Plaintiffs have not alleged any facts suggesting that defendants did not have a good faith basis for disputing the allegations. All they point to is the fact that Abbot entered

a consent decree five weeks later.[8] If there are facts suggesting that Abbott did not have such a good faith basis, plaintiffs must plead them. Otherwise, Abbott was entitled to put the FDA to its proof.

Having reviewed the statements individually, we consider them collectively. *See* In re Next Level Systems Securities Litig., 1999 WL 387446 at *4 (N.D. Ill. Mar. 31, 1999). Looking at the big picture, the statements which plaintiffs allege to be fraudulent focus on general corporate performance, progress on specific products, the new acquisitions and the pharmaceutical business. They say little, if anything, about ADD's regulatory compliance. No reasonable investor would be misled.

## B. The ALZA Shareholders

Of the twelve statements listed above, there are two that this complaint does not cite at all: the annual report and White's April 23, 1999, comments. We need not discuss them with respect to these plaintiffs.

On five additional occasions the complaint refers to a document without identifying any specific statement as misleading. These are the two 10Q's (May 14 and August 13, 1999), the July 9 Perclose acquisition announcement, the August 16 proxy statement and the September 29 press release. Like the Abbott shareholders, plaintiffs here contend that these documents are misleading because they do not disclose the regulatory issues. For the same reasons discussed there, these allegations fail for lack of particularity. *See* Fed. R. Civ. P. 9(b); DiLeo, 901 F.2d at 627; 15 U.S.C. 78u-4(b)(1).

Before we examine particular statements' content, we consider which ones,

---

[8] We note that even in the consent decree, Abbott explicitly disclaims any wrongdoing.

chronologically, these plaintiffs may legally rely upon. ALZA shareholders may only base their claims on statements made "in connection with" the acquisition. 15 U.S.C. § 78j(b). Defendants contend that all statements before the acquisition announcement on June 21, 1999, were not "in connection" with the plaintiffs' purchase. "However, the 'in connection with' requirement should not be interpreted as imposing such a discrete time frame in order for fraud to be actionable under Rule 10b-5. It has been said that 'specific dates of circumstances giving rise to or constituting fraud are not significant, so long as there is some temporal relationship between the events and the purchase of stock.'" See Issen v. GSC Enterprises, 508 F.Supp. 1278, 1286 (N.D. Ill. 1981) (citation omitted). This requires factual determinations which we cannot make on the pleadings. On the other hand, the last purchase by a named plaintiff was August 12, 1999. Statements made after named plaintiffs purchased their stock cannot form the basis for § 10(b) liability, even if other class members purchased later. See Roots Partnership v. Lands' End, Inc., 965 F.2d 1411, 1420 & n.6 (7th Cir. 1992). ALZA plaintiffs cannot rely on statements made after August 12, 1999. This precludes the October 11 press release.[9]

This leaves three viable statements, the April 8 press release, the June 21 ALZA announcement and the July 9 press release. Plaintiffs invoke three separate legal theories as imposing a duty to disclose on defendants. First, like the Abbott shareholders, they assert that because defendants omitted information about the FDA investigation, the statements defendants did make were somehow misleading. Second, they claim SEC Rule S-K required disclosure. And third, plaintiffs argue that White's "insider" trade triggered a duty to disclose

---

[9] This would also bar any claim based on the August 13 10Q, the August 16 proxy materials or the September 29 press release, which we previously rejected on other grounds.

any material non-public information. All three fail.

As above, plaintiffs must point to a specific statement that is made misleading by the omission. We look at the ALZA announcement first. Plaintiffs quote four paragraphs from the press release, none of which discusses the diagnostics division at all. The first simply identifies the parties. The second describes the terms of the agreement – the exchange ratio, the estimated value, the accounting method and the timetable. The last sentence notes that the deal is "subject to approval by ... regulatory agencies," but this is clearly a reference to the FTC concerns that ultimately scuttled the deal. The third and fourth paragraphs talk about the fit between the ALZA, a pharmaceutical company, and Abbott's pharmaceutical division. The word "pharmaceutical" appears six times in these two paragraphs. The word "diagnostic" does not appear once in the entire excerpt, nor is there a single reference to the FDA. The discussion of how ALZA will impact Abbott's future pharmaceutical performance and products could not possibly lead a reasonable investor to draw inferences about ADD's FDA compliance.

White also made public statements following the formal announcement, as reported in various newspapers on June 22, 1999. The Chicago Tribune quotation, like the official press release, touted how ALZA "fit well" with Abbott's existing products and infrastructure. There can be no real dispute that this refers to how ALZA will help Abbott's pharmaceutical division. Again, no reasonable investor could draw conclusions about ADD from this statement. The Los Angeles Times quotation does speak about Abbott generally. All it says, however, is that Abbott has a *goal* of reaching a "higher level of performance," and that they are "building on the strength [they've] established over the decades." At most, this is

incredibly vague puffery. And even that stretches the words' meanings. Read more reasonably, this statement does not even contain a prediction of future performance. Plaintiffs do not claim that Abbott was not *trying* to grow, or that Abbott had not built itself over many decades.

The July 9, 1999, press release discussed Abbott's third quarter performance, including historical sales and earnings. Accurate statements of historical fact, such as past financial results, are not actionable. *See* Next Level, 1999 WL 387446 at *6. Plaintiffs do not challenge these figures as factually wrong; they do not predict anything for the future; and they do not suggest anything about regulatory compliance that could possibly be misleading. Consequently, they are not actionable. The release also mentions the two acquisitions, several strategic alliances and specific FDA approvals. These are all true facts. Since no reasonable investor could imply from the fact that the FDA approved certain products that there could not be problems with others, this statement is not misleading either.

Lastly, we examine the April 8, 1999, press release. In form, it was similar to the July 9, 1999, release, reporting quarterly results and describing "Business Highlights." But plaintiffs only identify two sentence fragments as potentially misleading, neither of which is meritorious. Abbott reported "record sales and earnings for the first quarter ended March 31, 1999," and "accomplished a great deal in the quarter." Again, accurate historical results are not actionable, nor is vague puffery. These statements do not suggest anything about regulatory compliance, and could not mislead investors about that topic. They are also not forward-looking. They do not predict anything in the future. The complaint also alleges that the release "went on to detail a dozen 'First Quarter Business Highlights.'" But it does not

identify the allegedly misleading statements. As discussed above, this is insufficient under Fed. R. Civ. P. 9(b), DiLeo, 901 F.2d at 627, and the PSLRA, 15 U.S.C. § 78u-4(b)(1).

As we did with the Abbott plaintiffs, we also consider the statements collectively, and with an identical result. *See* Next Level Sys., 1999 WL 387446 at *4. The statements in question deal predominantly with the merger, Abbott's pharmaceutical business and general corporate performance. They say little, if anything, about diagnostics or regulatory compliance. No reasonable investor would be misled.

Having failed to establish that the statements themselves were misleading, plaintiffs turn to SEC Regulation S-K, specifically Item 303(a)(3)(ii), as the source for Abbott's supposed duty to disclose. *See* 17 C.F.R. 229.303(a)(ii). Unfortunately for plaintiffs, the caselaw is clear that Item 303(a) does not give rise to private action under Rule 10b. *See* Kriendler v. Chemical Waste Management, 877 F.Supp. 1140, 1151, 1157 (N.D. Ill. 1995), *citing* In re: Verifone Sec. Litig., 11 F.3d 865, 870 (9th Cir. 1993). Plaintiffs' cases do not contradict this proposition. The disclosure rules are probative of what a company is otherwise obliged to disclose, but they do not create an independent duty. *See, e.g.,* F&M Distrib. Sec. Litig., 937 F.Supp. 647, 654 (E.D. Mich. 1996). Absent some other basis for the duty, plaintiffs cannot rely solely on Item 303(a).

Finally, plaintiffs claim that White's April 13, 1999, trades triggered a duty to disclose. Insiders must either disclose any material non-public information, or abstain from trading in their company's stock. *See* United States v. O'Hagan, 521 U.S. 642, 651 (1997) (affirming insider trading conviction). White is undisputably an insider. But, once again, this rule does not create a duty for Abbott to disclose anything here. Unlike O'Hagan, this is not an insider

trading case. An insider's duty to disclose is not "transferable to the securities fraud claim against the corporate defendant or the individual defendants." <u>In re: Seagate Technology II Sec. Litig.</u>, 843 F.Supp. 1341, 1369 (N.D. Cal. 1994), *quoted in* <u>In re: Sofamor Danek Group</u>, 123 F.3d 394, 403 (6th Cir. 1997). Nor have plaintiffs pled a Section 11 claim for a defective registration statement. *See* 15 U.S.C. § 77k(a); <u>Shaw</u>, 82 F.3d at 1204 (noting Section 10(b) and Rule 10b-5 do not contain comparable disclosure requirements to Section 11).[10] White's transaction does not provide the requisite duty for Abbott to disclose.

## III. Scienter

Lastly, we turn to the scienter requirement. Under the PSLRA, plaintiffs must allege facts giving a strong inference of motive and opportunity, or facts providing strong circumstantial evidence of conscious misbehavior or recklessness. *See* <u>Rehm</u>, 954 F. Supp. at 1252. Even at the motion to dismiss stage, we must consider the alleged facts and the inferences they support. Under the heightened pleading standards it is not sufficient that a reasonable jury could infer scienter. The complaints must create a strong inference. Essentially this means that the most reasonable interpretation of these facts is mischievous. The complaints fall far short of this standard.

Plaintiffs' main argument is that defendants knew of, or recklessly disregarded, a serious threat to the company's prospects. But the inspection results did not necessarily mean that 20% of Abbott's revenues were substantially at risk. As we discussed above, given the history between Abbott and the FDA, defendants could have reasonably believed that the sequence of re-inspections and negotiations would continue. Plaintiffs cite a 1995 incident,

---

[10] Plaintiffs quote language from <u>Shaw</u>, discussing the prohibition on insiders from trading unless they disclose. The following page explicitly distinguishes Section 10(b).

where the FDA's delayed approval of an Abbott product because of regulatory violations, as proof that defendants knew severe sanctions were imminent. But this consent decree was unprecedented, requiring Abbott to recall 125 products, not just one, and to pay a $100 million fine, the largest ever by the FDA. The complaint does not identify any facts suggesting defendants knew the FDA planned to impose sanctions anywhere approaching the draconian penalties included in the decree.

The evidence of motive is even weaker. Plaintiffs point to the fact that White "sold" approximately 30% of his Abbott shares during the class period. Heavy sales by an insider could well be evidence of motive. Here, however, White used those shares to exercise options and actually increased his holdings.[11] Admittedly, if the market price is higher, the option holder will have to exchange fewer shares to exercise the same number of options. But the options' terms usually dictate when the holder may exercise them. Because plaintiffs have not alleged specific facts to the contrary, we find nothing sinister in White's actions here.

Plaintiffs also argue that defendants delayed disclosing the FDA issues to facilitate their pending mergers. But the September 29 press release, only nine days before Perclose shareholders were scheduled to vote on the transaction, belies any such argument.

More generally, the weakness of plaintiffs' arguments on the materiality and misleading statement elements also hurts them here. One who intends to defraud must get the market to believe something that is untrue. Omitting marginally material facts will rarely mislead

---

[11] The transaction works as follows: The option holder computes the total funds required based on the number of options and their exercise price. Then one computes how many shares, at the current market price, equal that same value. The company "buys" that number of shares from the holder and applies the proceeds to the exercised options. This enables the holder to exercise the options without having to invest additional cash. It is a "sale" in name only. This transaction does not create the same appearances, and therefor should not carry the same implications as an insider selling in the open market.

anyone. The perpetrator would probably omit something that is more likely to affect the market. Similarly, an attempt to defraud will probably refer to the issue in question more directly. Defendants' statements barely referenced regulatory compliance and did so in the most vague terms. As we discussed above, no one is likely to infer anything untrue about Abbott's regulatory status from these statements. One who intends to defraud will probably go to greater lengths to ensure that investors draw the untrue inference.

None of these considerations establishes conclusively that defendants did not intend to defraud shareholders. Combined with other facts, they could imply malfeasance. But plaintiffs bear the burden to plead facts giving a "strong inference" of scienter. The alleged facts here are all susceptible to innocuous interpretations. Plaintiffs have failed to meet their burden.

## CONCLUSION

The allegations do not give rise to a § 10(b) violation. Without a predicate § 10(b) violation, plaintiffs cannot state a § 20(a) controlling person claim. *See* <u>Krieger v. Gast</u>, 1998 WL 677161 (N.D. Ill. Sept. 22, 1998). Defendants' motions to dismiss both complaints are granted.

JAMES B. MORAN
Senior Judge, U. S. District Court

Jan. 25      , 2001.